IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2014

## REUBEN HICKOK FAIRFIELD v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C-13-112      Roy Morgan, Jr., Judge**

_____

**No. W2013-01482-CCA-R3-PC  - Filed April 30, 2014**

_____

The Petitioner, Reuben Hickok Fairfield, pled guilty to second degree murder and tampering
with evidence, and he agreed to concurrent sentences of thirty-five years, at 100 percent, for
the second degree murder conviction and to six years, at 30 percent, for the tampering with
evidence conviction. The Petitioner filed a *pro se* petition for post-conviction relief, which
was amended by appointed counsel. The post-conviction court dismissed the petition after
a hearing. On appeal, the Petitioner asserts that the post-conviction court erred when it
dismissed his petition because his counsel was ineffective and his guilty plea was not
knowingly and voluntarily entered. After a thorough review of the record and applicable
authorities, we conclude that the post-conviction court did not err when it dismissed the
petition. The post-conviction court's judgment is, therefore, affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which THOMAS T.
WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Joseph T. Howell, Jackson, Tennessee, for the Appellant, Reuben Hickok Fairfield.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney
General; James G. Woodall, District Attorney General; and Jody Pickens, Assistant District
Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

#### A.  Guilty Plea Hearing

This case arises from the beating death of the victim, Lionel Deshun Harris, on February 7, 2012, in Madison County, Tennessee. As a result of Harris's death, a Madison County grand jury indicted the Petitioner on charges of first degree murder and tampering with evidence. At the guilty plea hearing, the State informed the trial court that, had the case gone to trial, the proof would have shown:

> [O]n or about February 7th, 2012 at about 7:30, Jackson Police Department responded to a business on North Highland just in front of Alexander School by the name of Jamaica Beautiful Braids. In the parking lot of the area beside there is a convenience store. Lionel Deshun Harris was found deceased in the parking lot with a serious head trauma. He was pronounced dead at the scene. A subsequent autopsy determined that the cause of death was multiple blunt force trauma to the head.
>
> During the investigation, [the Petitioner] was developed as a suspect. . . . . [The Petitioner's] sister dated the victim. . . . According to witnesses and also according to a statement that [the Petitioner] later gave, that he intended to confront the victim about an allegation concerning the victim having touched a family member, a minor family member.
>
> On February 7th shortly before 7:30, the victim had been at the [Petitioner's] home and borrowed $50 from the [Petitioner's] mother. Just before the victim left the home, the [Petitioner] left and intercepted the victim as he was waiting at the bus stop there in the area – or proceeding to the bus stop in the area of Alexander School. He was talking – the victim was talking on the cellphone. [The Petitioner] approached the victim. The victim crossed the street to get away. [The Petitioner] subsequently in an altercation struck the victim approximately six times in the head with a hammer that he had taken from his home prior to his going to meet the victim.
>
> [The Petitioner] fled the scene, threw the hammer in the alley between Division and Wisdom Street. The hammer was subsequently recovered and was found to have the victim's DNA in the form of blood.

The Petitioner agreed that the statement of fact as given was substantially correct. The trial court informed the Petitioner that he was taking a "higher range and a higher sentence" as a result of a negotiated plea to second degree murder. The Petitioner acknowledged his understanding of this. The trial court then went on to question the Petitioner and ensure that he was entering his plea knowingly and voluntarily. In that vein, the trial court ensured the Petitioner was not under the influence of drugs or alcohol, ensured that he had not been

forced or pressured to enter a guilty plea, and confirmed that the Petitioner was not promised anything in exchange for his plea. The trial court then accepted the Petitioner's guilty pleas and entered the negotiated sentence.

## B. Post-Conviction Petition

The Petitioner filed a petition for post-conviction relief alleging that he had received the ineffective assistance of counsel and that his guilty pleas were not knowingly and voluntarily entered.

At a hearing on the petition, the parties presented the following evidence: The Petitioner testified that he had been charged with first degree murder and tampering with evidence. He said that he "never" denied his role in that offense. His appointed counsel ("Counsel") represented him when he entered a guilty plea to the charges. He said that he was "misguided by the plea," he "didn't understand nothing of it," and it was "fast and [he] wasn't thinking properly." The Petitioner acknowledged that the trial court questioned him during the hearing about whether he understood what he was doing and whether he was satisfied with Counsel's representation. He said that he answered these questions affirmatively because he "was rushed" and "wasn't thinking." He felt he was under a lot of pressure and was coerced into taking a plea by Counsel's telling him that he could receive life in prison or the death penalty. The Petitioner said that, at the time, he did not know the law and did not have access to tools to help him do legal research. Since he had been incarcerated, however, he had researched the law and felt that entering a plea was not "the way to go."

The Petitioner informed the post-conviction court that the "basis of [his] claim" was that Counsel "rushed [him]" and "kinda coerced [him]" into taking the plea. He said that Counsel did not offer a defense strategy, and Counsel told him, "Ain't nothing we really can do." The Petitioner said he wanted to plead to a "lesser charge like voluntary manslaughter or reckless homicide." Counsel, however, repeatedly told him to take the plea offered by the State, which was to second degree murder. The Petitioner said he was under "a lot of pressure" and felt "scared" because this was his first time "getting into any violent . . . stuff like this." He said he had no previous criminal record.

The Petitioner testified that he was charged with first degree murder, pled to second degree murder, and agreed to an out-of-range sentence of thirty-five years. The Petitioner said he did not realize he agreed to an out-of-range sentence because he "really kn[e]w nothing about the charge." The Petitioner said his plea was not knowingly and voluntarily entered because it "wasn't really talked over with me . . . correctly."

The Petitioner testified that Counsel only came to visit him three times, usually staying for only five minutes. The Petitioner said that Counsel should have negotiated for a plea to a lesser charge based upon the fact that the Petitioner had "a mental issue." He said he had been going to "Pathways" since he was a young child, and he was supposed to be on medicine because he had been diagnosed with psychosis, bipolar, and "something else." He said he was not taking any medication on the day of this murder, and he should have been. The Petitioner said that, when he was medicated, he was not "so quick to act off impulse." He would have been "mellowed down" and would not have reacted so quickly to what his niece had told him. The Petitioner said that, shortly before the murder, his niece had informed him that the victim had been touching her and "messing with her," so the Petitioner wanted to fight him. The Petitioner said he never intended to kill the victim, and, when the victim fell to the ground, "it just went from there." The Petitioner asserted that he was not a bad person but that he just made a mistake.

The Petitioner testified that he informed Counsel of these facts but that Counsel did not discuss them with him. He told the Petitioner that he would have to prove these facts and then the charges might be dropped to manslaughter. Counsel then repeatedly advised him to take the plea agreement.

The Petitioner said that he asked Counsel if Counsel could negotiate for a reduced sentence or get him parole because the Petitioner was a "good person" and had not been in any other trouble. Counsel told him that the State denied this request and informed the Petitioner that he would be required to serve his full sentence.

During cross-examination, the Petitioner conceded that he had been involved in a homicide as a juvenile. He said he was charged with homicide, but the charge was later reduced. He said he was also charged with civil rights intimidation related to this homicide because he had written a note threatening a Middle Eastern shopkeeper, and then someone else shot the shopkeeper. The Petitioner denied that he was present during these events.

The Petitioner said he did not remember the trial court's questioning him at the guilty plea hearing about the voluntariness of his plea. He did not remember the trial court's telling him he could interrupt the proceedings if he did not understand anything. Even after reading a transcript of the guilty plea hearing, he still did not recall this. The Petitioner said he did not recall the trial court's informing him that he was pleading "outside of [his] range." The Petitioner similarly did not recall informing the trial court that he did not understand what this meant or the trial court's informing him of the ramifications of pleading outside of his range.

The Petitioner agreed that the facts of his case were that the Petitioner armed himself

-4-

with a hammer and chased down the victim. The Petitioner then struck the victim multiple times with the hammer. He said, however, he "didn't think a hammer could do that much damage." The Petitioner said that he wanted to put the victim in the hospital, in intensive care, because he was touching his niece. He explained that he was going "off impulse" and his "emotions." He agreed that he intentionally armed himself with the hammer before the incident.

The Petitioner said that Counsel never looked into the allegation that the Petitioner had learned shortly before this killing that the victim was molesting the Petitioner's niece. The Petitioner agreed that Counsel had told him that he could not find anything to substantiate the Petitioner's claims.

The Petitioner agreed that Counsel had the Petitioner evaluated before the guilty plea by Dr. Woody Kennon. The Petitioner said Counsel never informed him that the doctor concluded:

> Throughout the evaluation [the Petitioner] demonstrated purposeful attempts to portray himself in a negative light. He demonstrated classic features of malingering to include not only Gasner-type responses but complaints of inconsistent symptomatology and dramatization of his alleged psychological problems, and [the Petitioner] was observed to be highly manipulative.

Counsel testified that he was an assistant public defender and was appointed to represent the Petitioner. He said that the Public Defender, George Googe, attended the first meeting that Counsel had with the Petitioner. Counsel said that he met with the Petitioner on several occasions. Shortly after meeting with the Petitioner, Counsel met with the Petitioner's mother and uncle at their home. He met with the Petitioner again after he had filed a motion for expert services. Counsel said that, after the two had met several times, there "came a time that we started talking about offers and negotiation." Counsel said he talked with the Petitioner about the first offer and then also about subsequent offers.

Counsel testified that he did not have any difficulty communicating with the Petitioner. The Petitioner never displayed a lack of understanding. Counsel recalled that he and the Petitioner discussed some lesser-included offenses that the Petitioner thought would be more appropriate. Counsel explained to him that they could present this to the jury, but they would need evidence to substantiate the Petitioner's claims. Counsel said he talked to the Petitioner's family specifically about the Petitioner's contention that he had just learned that the victim was molesting the Petitioner's niece, and all of his family members denied any knowledge of any alleged sexual abuse. In any event, Counsel opined that the State could

still present sufficient evidence to prove first degree murder.

Counsel said that he and the Petitioner discussed the possible consequences of the Petitioner's being tried and convicted of first degree murder. Counsel informed the Petitioner that the State had not yet filed a notice seeking the death penalty, but he explained that the State still had time to so do. He explained to the Petitioner that, in the event that the State did not seek the death penalty, the Petitioner would face a sentence of life in prison with the possibility of parole or life in prison without the possibility of parole if convicted of first degree murder.

Counsel testified that the State offered to allow the Petitioner to plead guilty to second degree murder if he agreed to an out of range thirty-five year sentence. He explained that this was more than the twenty-five year maximum sentence for second degree murder but it was less than a sentence of life with parole. Based upon Counsel's experience, and also in Public Defender Googe's opinion, this was an offer that the Petitioner should consider accepting, and they recommended as much to him.

Counsel said that the expert who examined the Petitioner indicated that the Petitioner was malingering. The report further indicated that the Petitioner was exaggerating his problems. Counsel said he was not going to be able to use the expert's report in defense of the Petitioner.

Counsel said that he was present during the guilty plea hearing. He had no indication that the Petitioner had any difficulty understanding the proceedings. Counsel said he would have stopped the proceedings if he thought the Petitioner was not fully comprehending his guilty plea and the consequences. Counsel said the Petitioner indicated after the guilty plea hearing that he thought that he "got a good deal" with the offer of thirty-five years.

During cross-examination, Counsel testified that he hired the expert because the file he received from the State about the Petitioner indicated that he had mental health issues. Counsel himself, however, never noted that the Petitioner had any mental health problems.

Counsel said that, to investigate the Petitioner's allegations of sexual molestation, he asked the Petitioner who could substantiate the Petitioner's claims. The Petitioner told him that his mother and his sister could do so. When Counsel interviewed the Petitioner's mother, she indicated that she did not know anything of that nature. Counsel said that the niece or nieces who were allegedly molested were "particularly young," and he did not speak to them directly. It was his understanding that they had been spoken to by a representative of the State in the past. He was certain that the State's file would have contained any indication of abuse.

Based upon this evidence the post-conviction court dismissed the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court erred when it dismissed his petition because his Counsel was ineffective and his guilty plea was not knowingly and voluntarily entered. The State counters that the Petitioner has failed to prove either of his claims. We agree with the State.

When denying the Petitioner relief, the post-conviction court found:

> The Court has certainly reviewed the Petitioner's claims, and it is based upon the claim of ineffective assistance of counsel.
>
> If you listen carefully to the testimony of [the] Petitioner, you would note that in here he said, "I really want my time cut." He wants the time cut from what he agreed to at the time of his plea bargain, is his basis for his post-conviction. Now I've reviewed the entire record, not just the testimony. He testified that he was under pressure, he was rushed, that his attorney rushed him, that he thought it was the right thing to do at the time but now he's studied the law, and I learned today they have Westlaw in TDOC. He changed his mind is what it amounts to in that respect. He felt like that it wasn't talked over with him and he was rushed. But after all that testimony again, he indicated he really wants a cut in his time.
>
> I want to note that the Court got the first degree murder case on arraignment day of July 9th, 2012. Most of you that know me know that I will set cases along the way without a lot of delay, but certainly on a case like this, I will give ample time for discovery and preparation.
>
> So on July 9th the [Petitioner] was arraigned and counsel was appointed. That's when [Counsel] came on board. On September the 17th, 2012 we continued it to November 13th to hear any motions, and we put a plea cutoff of December 10th and a trial date of February 5th. So there was not a rush at all to pressure anyone to do anything as far as [the Petitioner] entering into any plea agreement. And on December 11th, he did enter into a plea agreement. It was one day later. In fact, he came in on December 10th. He was here and I believe I continued it to the next morning to even give him that extra time to think about it, if y'all will recall, according to my docket sheet,

-7-

to make sure everyone was in agreement and had a clear understanding. So I note all that for the record.

The Court also notes from the testimony and the record that the charge was reduced from first degree murder to second degree murder. The Court notes for the record that it's very clear that the [Petitioner] was advised by the plea form he signed as well as by the Court as evidenced by the transcript in this case which is Exhibit 1[,] I believe[,] as to him pleading outside of his range.

It's the Court's job today to judge the credibility of each and every witness in this case, and I have to do that as I considered the testimony of the Petitioner . . . and [Counsel]. And one thing that speaks volumes, the guilty plea transcript, Exhibit 1, dated December 11th, 2012, it's very clear the questions asked and the responses given. In great detail the [Petitioner] is advised of all of his rights, including pleading outside his range. He responds very clearly. The Court notes today that the [Petitioner] had no problems communicating December the 11th, 2012 and he had no problems communicating today as he testified and responded to the questions.

The Court further finds as evidenced by Exhibit 2 and the testimony that defense counsel went so far as to get ex parte orders signed to get an evaluation done in this case to be assured that his client was in a proper state to proceed on . . . a plea or trial. The Court finds that defense counsel reviewed everything with the [Petitioner]. He's testified to that effect. The Court reviewed with the [Petitioner] in his plea. But all options were discussed according to [Counsel's] testimony today. It was very clear from [Counsel's] testimony that the [Petitioner] . . . even made his own offer to the State to try to settle the case by agreement, and that was rejected and then ultimately an agreement was reached.

The [Petitioner] communicated very well today. He has a twelfth grade education. He dropped out in the twelfth grade, but he certainly quickly followed up with his GED, and he had logical and clear answers as he responded today. No trouble at all did he indicate in understanding not even one question.

All that having been noted, the Court finds that the [Petitioner] at the time of his plea again freely, voluntarily, knowingly, intelligently and personally entered that plea on that occasion, that he has failed to carry the

burden today by clear and convincing evidence as to any issue on ineffective assistance of counsel.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

The Petitioner contends that Counsel was ineffective because he did not develop a theory of defense and only briefly met with him on three occasions. The Petitioner asserts that this made him feel compelled to accept the negotiated plea, rendering his guilty plea

unknowingly and involuntarily entered.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). To demonstrate prejudice in the guilty plea context, the petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, he would not have pleaded guilty and would have insisted on going to trial. *Calvert v. State*, 342 S.W.3d 477, 486 (Tenn. 2011).

After reviewing the record in this case, we conclude, as did the post-conviction court, that Counsel's performance was not deficient and, in any event, the Petitioner did not prove he was prejudiced. Counsel, along with Public Defender Googe, met with the Petitioner and then met with the Petitioner's family. The Petitioner claimed he killed the victim in anger over allegations that the victim molested his niece or nieces. The Petitioner informed Counsel that his mother and sister could substantiate his claims. Counsel interviewed the Petitioner's mother and sister and neither claimed to have any knowledge of these allegations. Counsel noted that, in the Petitioner's file, it mentioned he may have a history of mental health treatment. Counsel hired an expert, ex parte, to interview the Petitioner. The expert reported to Counsel that the Petitioner displayed signs of malingering. Lacking any sort of plausible defense, Counsel negotiated a plea agreement on the Petitioner's behalf, which reduced his conviction to second degree murder if the Petitioner agreed to an out of range sentence. The Petitioner agreed, and, at the time, he was satisfied with the agreement. We conclude that the Petitioner has not proven that Counsel was in any way deficient.

We further conclude that the Petitioner cannot show that Counsel's performance in any way prejudiced him. The Petitioner has not proven that, but for Counsel's alleged deficient performance, he would not have pled guilty. The Petitioner sought a plea agreement, expressed a total understanding of the plea agreement at the time it was entered, and was satisfied with the plea agreement. The agreement reduced the charge he was facing, despite the strength of the State's case, in exchange for an out of range sentence. The out of range sentence of thirty-five years was significantly less than the possible life sentence if the Petitioner were convicted of first degree murder. The Petitioner is not entitled to relief on this issue.

## II. Conclusion

After a thorough review of the record and the applicable law, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE